HUGHES *et al. v.* TREADAWAY, adm'r, *et al.,* and *vice versa.*

1. In order to take a debt out of the operation of the statute of limitations, it must be shown to have been kept alive by a new promise in writing which plainly and unmistakably refers thereto. As a general rule, an executor is without power to bind the estate he represents by an original undertaking on his part; nor is a note given by him in his representative capacity to be regarded as a promise to pay a particular debt, when such note does not identify any outstanding claim against the estate.

2. A decree whereby an executor was granted leave to mortgage property belonging to the estate of his testator is not binding upon a creditor who was not made a party to the proceeding wherein such decree was rendered.

Argued November 14,—Decided December 10, 1902.

Equitable petition. Before Judge Henry. Floyd superior court. May 26, 1902.

*Fouché & Fouché,* for Hughes et al.

*Joel Branham, Halsted Smith, W. J. Neel, McHenry & Maddox, John H. Reece,* and *T. W. Lipscomb,* contra.

LITTLE, J. The facts brought to light upon the trial of this case in the court below were, in brief, as follows: Prior to November 10, 1890, G. W. F. Lamkin and Samuel Funkhouser were partners in the real estate business, and operated under the firm name of Lamkin & Funkhouser. In the early part of that year, J. H. Reyn-

olds, G. W. F. Lamkin, R. G. Clark, Samuel Funkhouser, and B. I. Hughes signed a written memorandum, of which the following is a copy: "Rome, Ga., May 7th, 1890. We, the undersigned, have jointly bought six hundred shares of Printup City Land & Improvement Co. stock, for fifteen thousand, five hundred dollars, to be divided as follows: Lamkin & Funkhouser 200 shares, R. G. Clark 133 [shares], B. I. Hughes 133 [shares], J. H. Reynolds 134 [shares]. We have given our joint note for $15,000.00, and the stock is held as collateral for payment of same." (To whom this note for $15,000 was made payable does not appear.) On October 16, 1890, Reynolds, Lamkin & Funkhouser, and Hughes executed a promissory note for $5,000, payable to R. G. Clark, and indorsed by him in blank. Another note for $5,000 was on the same day signed by Clark, Lamkin & Funkhouser, and Hughes, and was indorsed by Reynolds, to whom it was made payable. A third note, also for $5,000, and payable to Hughes and indorsed by him, was on that date executed by Reynolds, Clark, and Lamkin & Funkhouser, as joint principals. (These three notes were intended, it seems, to take the place of the $15,000 note, which appears to have been previously destroyed; but who eventually became the holder of any one of them is not disclosed by the record.) On November 10, 1890, Lamkin died testate. His will contained, among other provisions, the following: (1) "I direct all my just debts paid as soon after my death as convenient." (2) "It is my will and desire that my four minor sons shall each have a good education, and to that end I authorize my executors, . . as far as in their judgment best, to keep my estate together for that purpose and the maintenance of said minors. But if it should be necessary for their education and their maintenance in like manner as I have maintained them, I authorize my executors to sell such of my real estate as they think best." Funkhouser, who was one of the executors nominated in the will, qualified; and on December 1, 1890, it was duly probated in common form. "On March 2nd, 1891, R. G. Clark having paid his share of the original note of $15,000.00, J. H. Reynolds, Samuel Funkhouser, and B. I. Hughes made to the First National Bank of Rome a demand note for $11,666.66, bearing interest from date." On the back of this note was the following unsigned memorandum: "$5,000.00 of this is to be paid by Lamkin & Funkhouser, $6,666.66 by John H. Reynolds and B. I. Hughes." Below this

memorandum were entered a number of credits, showing that Funkhouser had paid $2,500, and Reynolds and Hughes each $3,300 on the note.    There also appeared on the back of the note the following entry: "The balance on this note is due by estate of G. W. F. Lamkin, for value received, $2,500.00.    Samuel Funkhouser, Exr. of G. W. F. Lamkin, Dec."    The interest on the $2,500 remaining due upon this note was regularly paid by Funkhouser, as executor, until January 1, 1894.    Subsequently, at the request of Reynolds, who was the president of the bank, and with a view to keeping in life its claim against the estate of Lamkin, four notes, dated December 31, 1893, payable to "B. I. Hughes, Cashier," and aggregating in amount, $3,554.50, were executed by Funkhouser, in his representative capacity, and delivered to the bank.    In none of these notes was there, however, any reference made to the original note for $15,000 or the three notes for $5,000 each, above mentioned as having been signed by the firm of Lamkin & Funkhouser.

On the 25th of December, 1894, Funkhouser filed, in the superior court of Floyd county, an equitable petition in which he named as parties defendant the legatees under the will of Lamkin, and in which he alleged, among other things, (1) that the estate in his hands consisted entirely of real property, the income from which was barely sufficient to pay taxes and repairs; (2) that, owing to a depression in the market price of such property, it could not be sold except at a great sacrifice; (3) that it required $900 per annum to maintain and educate the minor children of the testator; and (4) that he had already advanced out of his own private means a large sum of money, in order to meet the expenses incident to carrying into effect the wishes of the testator as to the maintenance and education of these minor children.    In this petition Funkhouser prayed that he be granted leave "to raise such sums from time to time, by mortgaging the realty, as [might] be needed to educate, support, and maintain the minor children, and pay taxes and make repairs on the property of the estate, and to reimburse him for money advanced to said children."    A hearing was had upon this petition and an answer filed in behalf of the defendants, and a decree was entered whereby the prayer of the petitioner was granted.    Acting under this decree, Funkhouser, as executor, negotiated three loans, one in March, 1895, another in July of the same year, and the third in March, 1896, in each instance execut-

ing a mortgage on specific property belonging to the estate he represented. He died on the 8th of August, 1901, without having paid off any of these mortgages, and E. P. Treadaway was appointed administrator de bonis non of the estate of Lamkin. At the date of the death of Lamkin he was solvent; but at the date of the death of Funkhouser the estate was insolvent, he having failed to discharge the debts of his testator in accordance with the will.

On December 2, 1901, B. I. Hughes, " as Cashier of the First National Bank of Rome," filed an equitable petition, in behalf of himself and such other persons as might wish to join with him as parties plaintiff, in which he named as defendants Treadaway, as administrator de bonis non of the estate of Lamkin, and the holders of the mortgages above referred to. In this petition the plaintiff set forth the following allegations of fact as a basis for the granting of the relief sought: On May 7, 1889, Lamkin, " jointly with R. G. Clark, S. Funkhouser, J. H. Reynolds, and B. I. Hughes, bought six hundred shares of stock in the Printup City Land and Improvement Company, and in part payment for said stock gave their joint promissory note for $15,000.00, payable to ————————, and at the time said G. W. F. Lamkin died said debt was unpaid, and the same is still unpaid. The executor, Saml. Funkhouser, had from time to time'renewed said debt, and there is now due to petitioner on said debt the principal sum of $3,554.50," besides interest and attorney's fees. No creditor of the estate of Lamkin was made a party to the proceeding whereby Funkhouser, as executor, obtained the decree of court granting him leave to mortgage property belonging to the estate in order to raise money for the purposes recited in such decree, " and petitioner never knew or heard of said proceeding until since the death of said executor and the appointment of E. P. Treadaway, administrator de bonis non." The said executor " neglected to pay the debts of the testator and applied the assets coming into his hands to the maintenance and education of the children of testator, and at the death of said executor the estate was insolvent, and, including the property mortgaged, there is not sufficient property to pay the just debts existing against the testator at his death." The mortgages executed by Funkhouser, as executor, in pursuance of the decree of court above mentioned, were in fraud of the rights of petitioner and other creditors of the testator, and if these mortgages.are paid off "in advance of petitioner's debt, petitioner will

lose his entire debt, or the greater part thereof, for the reason that said estate is now insolvent." Acting under an order granted by the court of ordinary, Treadaway, the administrator de bonis non, has " advertised all the property of the testator for sale, for cash, . . including the land described in the mortgages aforesaid ; " and while the holders of the mortgages can not, as against petitioner, assert any valid lien on the property therein described, yet they constitute a " cloud upon the title to the property, . . and if said sale is made by the administrator, the title will be further complicated and beclouded, and the property will be sacrificed," to the injury of petitioner and other creditors of the estate.

The plaintiff prayed in his petition, (1) that Treadaway, as administrator, " be enjoined from selling the property attempted to be mortgaged, as alleged ; " (2) that the holders of the mortgages " be each enjoined from proceeding to foreclose their said mortgages or to collect the notes held by them, and that said mortgages be decreed to be surrendered and cancelled ; " (3) that each of them be required " to refund to the administrator de bonis non all the money paid to them on the notes and mortgages held and claimed by them, as aforesaid ; " and (4) that petitioner " have judgment for his debt," and such other and further relief as to the court might seem equitable and just. In response to this petition, Treadaway, the administrator de bonis non, filed an answer in the nature of a cross-petition to marshal assets, wherein he alleged that he was unfamiliar with the actings and doings of Funkhouser, the executor, and was therefore unprepared either to admit or deny the main allegations relied on by petitioner. Treadaway did, however, fully set forth the condition of the estate when he took charge of it, and gave the names of a number of persons holding claims against it who were not made parties to the petition. He asked that they be made parties to the case, and that the court should determine the rights of all persons concerned and give him proper direction in the premises. Separate answers were filed by two of the holders of the mortgages executed by Funkhouser, as executor, in which they took issue with petitioner as to the validity and priority of the mortgages held by them. They also joined with Treadaway, as administrator, and the holder of the other mortgage attacked by the plaintiff, Hughes, in an answer setting up that his claim against the estate of Lamkin was barred by the statute of limitations. Among

other persons whom Treadaway in his answer prayed should be made parties to the case was W. T. Jones, who held a claim against the estate for a monument sold by him to Lamkin during his lifetime, and who made an appearance before the court and set up his claim. By consent of all parties, the presiding judge passed upon all issues of law and fact, without the intervention of a jury, and entered a final decree in the case. Among other things, he adjudged (1) that the claim of Hughes, the cashier of the First National Bank of Rome, was "a valid liquidated demand against the estate of G. W. F. Lamkin;" (2) that the claim of Jones was "a valid subsisting debt against" said estate; and (3) that each of the holders of the three mortgages executed by Funkhouser, as executor, had a valid and subsisting lien on the property pledged to secure his mortgage debt, which was superior to the claims of all other creditors. To this finding in favor of the holders of these mortgages both Hughes and Jones excepted, and joined in suing out a writ of error to this court. Thereupon the administrator de bonis non, the holders of the mortgages just referred to, and other parties below sued out a cross-bill of exceptions, in which complaint is made that the judge erred in entering up judgment in favor of Hughes, for the reason that the evidence showed conclusively that his claim was barred by the statute of limitations.

1. A proper decision of the question raised by the cross-bill of exceptions disposes of the case, so far as Hughes is concerned. Whatever may have been his purpose in referring in his petition to the original note for $15,000 signed by himself, Clark, Funkhouser, Reynolds, and Lamkin, certain it is that he did not show any right to recover thereon. Indeed, the evidence does not disclose to whom this note was made payable, or that either Hughes or the bank of which he was the cashier ever became the legal or equitable holder thereof. Furthermore, if it was still outstanding and unpaid, it was clearly barred by the statute of limitations. In point of fact the three notes for $5,000 each, upon which the firm of Lamkin & Funkhouser was bound, were designed to take the place of the $15,000 note. Only one of these three notes was made payable to Hughes, and, so far as appears, he never acquired title to either of the others. All were dated October 16, 1890, and due, respectively, on February 1st, February 10th, and February 20th, 1891. They were not under seal, and therefore were barred on their face

at the time Hughes filed his petition.    Presumably they were dis-
counted at the First National Bank of Rome; for it appears that
on "March 2nd, 1891, R. G. Clark having paid his share of the
original note of $15,000.00, J. H. Reynolds, Samuel Funkhouser,
and B. I. Hughes made to the First National Bank of Rome
a demand note for $11,666.66," with the view, evidently, of
releasing Clark from further liability on the three notes of $5,-
000 each, and substituting for them a new evidence of indebted-
ness.    At the time this demand note was given, the firm of Lam-
kin & Funkhouser had been dissolved by the death of Lamkin.
Accordingly, Funkhouser, as surviving partner, had no power to
bind the firm by a novation of the contract into which it had en-
tered; and he did not in fact undertake, in that capacity, to create
a liability against the estate of Lamkin by signing the note for
$11,666.66 in the name of the partnership.    "After the dissolu-
tion of a partnership, one partner has no power to bind the firm
by a new contract, nor to renew or continue an existing liability,
nor to change its dignity or nature."    *First National Bank* v. *Ells,*
68 *Ga.* 192.    So it is clear that even if Hughes had been the payee
of the note last mentioned, which he was not, he could not have
held the estate of Lamkin liable thereon.    The entry on the back
of it, signed by Funkhouser, as executor, that " The balance on this
note is due by estate of G. W. F. Lamkin, for value received,
$2,500.00," was not, from a legal standpoint at least, true.    Nor
can this entry by the executor be construed into a new promise to
pay the note for $5,000, signed by Reynolds, Clark, and the firm
of Lamkin & Funkhouser, in which Hughes was named as payee.
" A written acknowledgment of indebtedness which does not specify
or plainly refer to the particular demand or cause of action to be
renewed or created by it is not sufficient to take the case out of
the statute of limitations where the contract or cause of action
sued on is barred."    *Kirven* v. *Thornton,* 110 *Ga.* 276, citing pre-
vious adjudications to the same effect.    Certain is it that the
above-quoted entry on the note for $11,666.66 did not refer to the
note for $5,000, payable to Hughes, or to any other outstanding
indebtedness against the Lamkin estate.    On the contrary, the
executor thereby undertook merely to acknowledge that the estate
he represented was bound to pay on this $11,666.66 note the
amount of $2,500, which was not true as matter of fact, and his

saying so created no liability on the part of the estate to pay that amount on this particular note, or operated as a new promise to pay any other note or other evidence of indebtedness which was binding upon Lamkin's estate. The parol evidence, relied on as connecting the note for $11,666.66 with the three notes for $5,000 previously signed in the name of his firm, was entirely unavailing; for, under the Civil Code, § 3788, "A new promise, in order to renew a right of action already barred, or to constitute a point from which the limitation shall commence running on a right of action not yet barred, must be in writing, either in the party's own handwriting, or subscribed by him, or some one authorized by him."

It is equally clear that the four notes executed by Funkhouser, as executor, on December 31, 1898, payable to "B. I. Hughes, Cashier," can not properly be treated as constituting a new promise to pay any particular outstanding indebtedness on the part of the estate. Each of them purports to be an original undertaking by the executor, and in none of them is there embraced an acknowledgment by him that Hughes held any valid claim against the estate. These four notes were given at the request of the president of the bank of which Hughes was cashier, merely in order to get "in better shape" its supposed claim against the estate of Lamkin on the $11,666.66 note hereinbefore mentioned, the president of the bank being under the impression that the effect of giving these new notes would be " to renew or extend that twenty-five hundred dollar" claim. On the hearing of the case he testified that: "The old notes were not surrendered to Mr. Funkhouser, for the reason that [the execution of the new notes] was not intended as a settlement, but to keep the debt alive." So it will be seen that Hughes was not entitled to recover on any of the notes made payable to him under this arrangement, because (1) there was no consideration for them, and (2) the executor had no power to create against the estate he represented a new and distinct liability. *Printup* v. *Trammell*, 25 *Ga.* 242 ; *McFarlin* v. *Stinson*, 56 *Ga.* 396; *Gaudy* v. *Babbitt*, 56 *Ga.* 642 ; *Deas* v. *McRea*, 65 *Ga.* 531.

2. In order to fix the priority of the claim which Jones set up against the estate of Lamkin, it is necessary to pass upon the question presented by the main bill of exceptions, viz. : whether or not the decree of court by which leave was granted to Funkhouser, as executor, to mortgage the property of the estate was binding upon

the creditors of the testator.   We have had no difficulty in reach-
ing the conclusion that this question should be answered in the
negative.   None of the creditors were made parties to the proceed-
ing wherein this decree was rendered.   It was the duty of the ex-
ecutor, both under the general law of this State and under the ex-
press terms of the will whereby he was appointed, to first apply the
assets of the estate to the discharge of the indebtedness of his tes-
tator.   It may have been true, as represented by Funkhouser in
his application for leave to mortgage, that, owing to a depression
in market prices, the property of the estate could not be sold to
advantage ; and doubtless a court of equity might very properly, if
all parties concerned were before it, have undertaken to pass upon
the expediency of meeting the emergency presented by creating a
mortgage debt.   The creditors of the estate would, however, have
an undoubted right to be heard as to this matter ; for, under the
law, they were entitled to have their demands satisfied without un-
usual or unnecessary delay.   If they objected to an indefinite post-
ponement of the sale of the property, the court would certainly
have no power to grant leave to the executor to place encum-
brances upon it, unless provision was made whereby the claims of
creditors should be satisfied in full out of the proceeds thus raised.
In other words, their legal rights could not, without their express
consent, be prejudiced by a decree conferring upon the executor
any power or privilege which he could not set up under the gen-
eral law governing the administration of estates, or by virtue of
special authority with which he was vested under the will.

As has been remarked above, an executor can not, ordinarily,
bind the estate he represents by any original undertaking on his
part.   (See cases last cited.)   A testator may, it is true, confer un-
usual powers upon a guardian or executor, provided, of course, the
rights of creditors are not thereby injuriously affected ; and in such
a case the will of the testator becomes the law by which his rep-
resentative is to be guided in managing his estate.   *Howard* v.
*Cassels*, 105 *Ga.* 412; *Brannon* v. *Ober*, 106 *Ga.* 168, 170.   But
where, as in the case at bar, an executor has no power under a will
to mortgage the property of an estate, the only course he can prop-
erly pursue, if in his judgment the property would be sacrificed if
brought to sale, is to apply to a court exercising equity jurisdic-
tion for authority and direction in the premises.   He then stands

upon the footing of any other trustee who seeks to exercise pow-
ers not conferred upon him by the instrument under which he was
appointed, and must bring before the court all persons at interest,
since he can not in such a proceeding represent any one save him-
self.    This whole subject was carefully considered and ably dis-
cussed by Mr. Presiding Justice Lumpkin in the case of *Wagnon*
v. *Pease*, 104 *Ga.* 417, in which prior decisions of this court bear-
ing upon the question in hand were reviewed.    In pointing out the
absolute necessity of having before the court all of the cestuis que
trust, he said (pp. 430 – 432): "To create a mortgage upon trust
property is not within the powers conferred by law upon a trustee
to be exercised at his discretion.    .    .    If, then, an emergency
arises which can not be successfully met in some other and better
way, the trustee may very properly bring to the attention of the
judge the necessity which exists of borrowing money and securing
the repayment of the same by mortgaging, in whole or in part, the
trust estate.    To this end, the trustee may present his petition,
fully setting forth the facts and praying that he be granted the
necessary power in the premises.    The law does not contemplate,
however, that the trustee shall have power to bind the cestuis que
trust by such a statement on his part of the exigencies of the case.
On the contrary, section 4865 of the Civil Code, which must be re-
garded as applicable, since the power to allow a trustee to create
a mortgage is included in the power to permit him to make a sale,
expressly provides, as to cases of this nature, that 'where any per-
son is interested besides the applicant, notice to such person must
be shown, or its absence accounted for, before the court shall pro-
ceed in the cause.'    .    .    Thus it will be seen that the benefi-
ciaries must themselves be properly before the court, which would
be an entirely useless formality, if not an absurdity, if the trustee
were authorized to represent them in the proceeding.    .    .    Doubt-
less our statute contemplates that the chancellor shall not regard
the trustee as having any power to represent the cestuis que trust
with respect to a matter clearly outside of the scope of his general
authority, and shall allow the persons to be affected an opportunity
to be heard in resistance to the application whereby the trustee
seeks a power which the law, in its wisdom, withholds from his ex-
ercise and vests with the court to be jealously guarded.    .    .    The
truth of the matter is, an application to a judge for power to mort-

gage would be a mere empty formality, if the trustee were allowed to represent the cestuis que trust therein and make to appear to the court only such a view of the situation as suited his purpose. In that event, the discretion reposed in the judge might oftentimes avail the beneficiaries nothing; for he could not be expected to exercise this discretion wisely and well if misinformed or imposed upon; and, looking to practical results alone, power to mortgage at pleasure might as well have been in the first instance vested directly in the trustee himself."

The reasoning upon which the decision in that case was based applies with equal force and weight to the proposition that if creditors are to be affected by such a proceeding, they must be served and given an opportunity to be heard. Clearly, therefore, it can not be seriously urged in the present case that Jones was bound by the decree authorizing the executor to mortgage the property of the estate, since the former was not made a party to the proceeding wherein that decree was rendered, and was given no chance to voice his objections to the granting of the application which the executor presented to the court. That it was imposed upon and induced to render an improvident decree is doubtless due to the very fact that the executor failed to inform the chancellor as to the true condition of affairs, if, indeed, he did not deliberately omit to mention that there were unpaid creditors, knowing full well that the court would not grant his petition if the rights of these creditors were brought to its attention. The persons to whom Funkhouser, acting under this decree, gave mortgages upon the property of the estate were bound to take notice, (1) that, under the general law of the land, he had no authority to create a mortgage debt binding upon the estate; (2) that no such authority was conferred upon him under the will; (3) that there might be unpaid creditors of the testator; and (4) if there were, a decree rendered upon the application filed by Funkhouser would not be binding upon them, they not having been made parties to the proceeding. In other words, these mortgagees are to be treated as having parted with their money with their eyes open, voluntarily taking the chances of creditors of the testator subsequently appearing on the scene and demanding the enforcement of their legal rights.

*Judgment on both the main and the cross bill of exceptions reversed. All the Justices concurring, except Lumpkin, P. J., absent.*